IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| PAMELA BOND, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:16-CV-00603-KOB |
| | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On February 22, 2012, the claimant, Pamela Bond, protectively applied for disability and

disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 237). In both

applications, the claimant alleged disability beginning on September 10, 2009, because of

sarcoidosis, atypical microbacteria, and neuropathy. (R. 273). The Commissioner denied the

claims initially on September 19, 2012, and again on reconsideration on February 8, 2013. (R.

175, 184). The claimant filed a timely request for a hearing before an Administrative Law Judge,

and the ALJ held a hearing on August 7, 2014. (R. 38).

In a decision dated October 22, 2014, the ALJ found that the claimant was not disabled

under the Social Security Act and thus not entitled to social security benefits. (R. 27). On

February 12, 2016, the Appeals Council denied the claimant's request for review. (R. 1). The

ALJ's decision thus became the final decision of the Commissioner. The claimant has exhausted

her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses the decision of the Commissioner and remands the case to the Commissioner for further proceedings.

## II. ISSUE PRESENTED

The claimant presents the following issue for review:

(1)  whether substantial evidence supports the ALJ's decisions to assign little weight to treating sources Dr. Jack Lichtenstein, rheumatologists; Dr. Daniel Hexter, neurologist; and Dr. Kioumarce Yazdani, internist.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.


# V. FACTS

The claimant was forty-five years old at the time of the ALJ's final decision (R. 89); had completed some college (R. 42); had past relevant work as a seal coat technician, billing manager, and medical billing specialist (R. 104); and alleges disability based on sarcoidosis, atypical microbacteria, and neuropathy. (R. 273).

## *Physical and Mental Impairments*

Dr. Mark Mossey admitted the claimant to Anne Arundel Medical Center in Maryland on September 10, 2009. Examinations found a 1.7 centimeter mass in the claimant's left lung, and a biopsy showed that the mass was a non-caseating granuloma. Further exams identified large hypodense lesions in the left and right lobes of the liver. (R. 388-397).

The claimant visited Dr. Kioumarce Yazdani on October 8, 2009 complaining of difficulty swallowing. Dr. Yazdani noted that the claimant had non-caseating granulomas and was experiencing pain after eating. (R. 645). The claimant saw Dr. Yazdani again on November 17, 2009 (complaining of incontinence and pain after eating); on December 14, 2009 (complaining of tender bowels); and on March 18, 2010 (for tests showing small colonic polyps). (R. 387, 645).

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

On October 22, 2009, Dr. Stephen Cattaneo saw the claimant for a consultation. Dr. Cattaneo noted that the claimant's symptoms and objective testing could represent sarcoidosis, a disease characterized by inflammatory masses, or granulomas, in different parts of the body. On November 11, 2009, Dr. Cattaneo admitted the claimant to Anne Arundel Medical Center for surgery to remove the lung nodule, which was successful. On December 3, 2009, Dr. Cattaneo wrote to Dr. Yazdani, the claimant's internist, regarding the claimant's further treatment. Dr. Cattaneo expressed that the claimant reported intermittent back and abdominal pain; that she had not eaten well and was inactive in her daily activities; and that he encouraged the claimant increase her activity. (R. 373-78, 380-84).

Dr. Cattaneo referred the claimant to Dr. Glen Gibson, a surgical oncologist, who examined the claimant on April 8, 2010. Dr. Gibson noted lack of increase in size of the claimant's liver masses and stated that the liver lesions were not contributing to her severe decline in general functional ability that manifested in September 2009. (R. 405).

On April 22, 2010, Anne Arundel Medical Center admitted the claimant because of complaints of leg pain without injury. Dr. David Todd performed spinal x-rays which showed scoliosis. The claimant returned to Dr. Yazdani on April 23, 2010, complaining of leg pain and on May 2, 2010, Dr. Yazdani completed a summary of the claimant's condition to that point. He noted that the claimant exhibited degenerative disc disease, non-caseating granulomas, frequent back pain, and chronic diarrhea. (R. 496, 646).

On June 18, 2010, the claimant visited Dr. Karenga Lemmons, an internist, for a second opinion on referral from Dr. Yazdani. Dr. Lemmons noted bilateral leg pain radiating down ankles with numbness that had been present for six months prior. Dr. Lemmons further noted

that the claimant appeared stressed and lacked understanding of her treatment history. Additionally, the claimant had 5/5 motor skills and a normal gait. (R. 426-28).

On July 28, 2010, the claimant saw Dr. Reena Thomas on referral from Dr. Lemmons for the reported numbness in her legs. Dr. Thomas stated that electrodiagnostic evidence showed chronic spinal root irritation, but no electrodiagnostic evidence of a myopathy[2] or large fiber peripheral neuropathy.[3] (R. 407, 498, 782-84).

The claimant returned to Dr. Lemmons' office on several occasions from June 30, 2010 to October 25, 2010 for follow-up with a nurse practitioner, Sharon Cave. The claimant consistently reported chronic left leg pain and numbness, intermittent pain in her right leg and left forearm, and swelling in her left leg. (R. 429-33).

The claimant presented for an infectious disease consultation with Dr. Rahki Krishnan on July 22, 2010, which showed caseating and noncaseating granulomas. Dr. Krishnan referred the claimant to the Johns Hopkins Sarcoidosis Clinic, and the claimant presented on November 3, 2010 for Dr. Edward Chen to evaluate her for possible sarcoidosis. The claimant reported experiencing burning pain in both legs. Dr. Chen observed significant generalized fatigue; no red, hot, or swollen joints; and normal gait and stance. Dr. Chen described the claimant's ailments and prognosis as a nodular variant of pulmonary sarcoidosis. Further, he recommended reassessment of the claimant's liver and spleen; a consultation with a gastroenterologist; repeated gadolinium MRIs to assess the claimant's leg pain; an echocardiogram to screen for pulmonary hypertension; and a sleep study. (R. 412-415, 782-83).

The claimant again returned to NP Cave in Dr. Lemmons' office on November 8, 2010 for a follow-up. The claimant reported that she was becoming fatigued between four to five in

---

[2] Muscle disease in which the muscle fibers do not function properly.
[3] Damage to the large peripheral nerves.

the afternoon each day, at which time she would sleep until two in the morning; further, she stated that she was using a walker. The claimant had an MRI on November 9, 2010, which showed signs of scoliosis, disc protrusions, and a high intensity zone. (R. 434).

The claimant followed up with Dr. Krishnan, the infectious disease consultant, on November 11, 2010. Dr. Krishnan stated that the final diagnosis was sarcoidosis and that the claimant should follow up further with Johns Hopkins. The claimant presented on November 16, 2010 for the sleep study recommended by Dr. Chen, which showed no significant sleep-related breathing disorder. (R. 504-08, 784).

On November 19, 2010, the claimant presented to Anne Arundel Medical Center for a right ankle fracture. The hospital referred the claimant to Dr. Edward Holt, an orthopedist, for further treatment. The claimant visited Dr. Holt for a foot and ankle exam on November 26, 2010. Per the claimant, she developed pain with weight bearing and turned abruptly, causing her right fibula to fracture. Dr. Holt recommended surgery to repair the claimant's fractured ankle, and performed an open reduction and internal fixation of the ankle fracture on December 1, 2010. (R. 510-11, 514, 586).

The claimant returned to Dr. Chen on December 7th, 2010 for test results. Dr. Chen indicated that per the MRI results the claimant's liver showed signs of hemangioma and a multicystic condition. Further, Dr. Chen indicated the claimant had clear signs of vitamin D deficiency; extensive degenerative changes in her mid-back; and disc problems in her lower back. He further recommended that the claimant visit a back specialist. (R. 416-17).

The claimant followed up with Sharon Cave, NP on December 17, 2010. The claimant again stated that she was using a walker, and NP Cave listed sciatica[4] as a diagnosis. (R. 435).

---

[4] Leg pain radiating along the sciatic nerve.

The claimant returned on January 10, 2011 complaining of worsening leg pain, back pain, and depression. (R. 416-417, R. 435-36).

The claimant returned to Dr. Holt's office numerous times from December 2010 to September 2011, primarily for follow-up and management of her healing ankle fracture. Dr. Speciale, an associate of Dr. Holt, noted on January 11, 2011 that the claimant used a walker prior to her injury. Dr. Holt reported the claimant complained of pain in her knee that began without any injury on February 1, 2011. On March 29, 2011, Dr. Holt noted a lack of progress in the claimant's post-surgery rehabilitation and continued pain, and prescribed a walking boot. The claimant returned to Anne Arundel Medical Center on May 5, 2011, for removal of the deep implants in her right ankle and repair of the peroneus brevis tendon. Dr. Holt switched the claimant from the boot to an ankle brace on June 14, 2011.

The claimant visited Dr. Holt for the last time on September 6, 2011. The claimant reported that her ankle was no longer painful and that she was ambulating comfortably; however, she further reported leg weakness. After evaluating the claimant's right ankle, Dr. Holt cleared her for full activity. (R. 565-582).

On referral from Dr. Chen, the claimant visited Dr. Carlos Pardo-Villamizar on February 9, 2011 for evaluation of neurological problems possibly related to the claimant's sarcoidosis. Dr. Pardo-Villamizar noted that the claimant demonstrated an abnormal gait secondary to an antalgic position and mild weakness. The doctor further noted that the claimant's condition was consistent with either radiculopathy[5] or meralgia paresthetica;[6] however, overresponsive reflexes indicated another possible spinal cord abnormality. (R. 601-02).

---

[5] Compressed nerve in the spine.
[6] Numbness or pain in the outer thigh because of injury to the nerve from the spinal column to the thigh.

In a note summarizing the claimant's visit on February 14, 2011, Dr. Jack Lichtenstein, the claimant's rheumatologist, stated that the claimant's case was "very confusing"; that she became sick while in the military and her records were incomplete; that her ankle fracture occurred spontaneously; that Dr. Chen diagnosed her with sarcoidosis but did not treat her; that the claimant felt poorly and was frustrated by the lack of medical answers for her condition; that her legs were weak; that she used a rolling walker; and that he suspected she might have an atypical form of tuberculosis. Dr. Lichtenstein further stated that he would consider treatment options, but at that time he had no reason to treat her with further medications. In a note dated April 13, 2011, Dr. Lichtenstein noted that the claimant had leg pains and swelling; that she had a history of sarcoidosis; that she had leg pain and weakness; that she used a rolling walker; and that she was being followed by several doctors. He further stated that he believed the leg weakness to be "primarily neurological." (R. 692, 694-95).

On referral from Dr. Yazdani, the claimant returned to Dr. Gibson on April 8, 2011. Dr. Gibson stated that the claimant was failing to improve and was in need of surgical evaluation. Further, Dr. Gibson believed that the claimant's liver lesions were not the cause of her malaise.

At the request of Dr. Ellen McInerney, her primary care physician, the claimant visited Dr. Howard Young, a pulmonologist, on April 20, 2011. Dr. Young stated that the claimant had a presumptive diagnosis of sarcoidois with swollen lymph nodes and lung lesions with caseating and non-caseating granulomas. Dr. Young further stated that the claimant needed further evaluation. (R. 656-657, 792-93).

The claimant visited Dr. Daniel Hexter, a neurologist, at the request of Dr. Lichtenstein on July 8, 2011. Electrodiagostic tests showed no evidence of peripheral neuropathy; however,

Dr. Hexter could not rule out small fiber neuropathy. Further, Dr. Hexter noted severe pain during the examination, and suspected the claimant might have meralgia parestetica. (R. 536).

On July 20, 2011, Dr. Lichtenstein wrote to Dr. McInerney, stating that the claimant was receiving physical therapy, which caused the claimant pain; that she used a walker but was capable of walking without the walker; that he was not clear why the claimant had so much leg pain and weakness; and that the claimant's back problems were not significant. On August 11, 2011, Dr. Lichtenstein again wrote to Dr. McInerney, stating that the claimant's condition was stable; that her legs were weak; that he was "not exactly clear" why the claimant required a walker to ambulate; and that he did not know why her pain had increased. He further indicated that he did not see a point to changing medication and that he was leaving it to the claimant to decide whether to continue physical therapy, which she stated was causing pain. (R. 689-90).

The claimant returned to Dr. Young on August 18, 2011. She reported that her coughing had subsided but she had difficulty breathing when active outside. Dr. Young stated that the claimant was doing well from a clinical pulmonary standpoint.

On September 19, 2011, the claimant received a splint after spraining her wrist from Dr. Shushan, an associate of Dr. Holt. No apparent injury precipitated the sprian, much like with her ankle fracture. (R. 653-54, 796-97).

The claimant returned to Dr. Pardo-Villamizar for a follow-up visit on September 21, 2011. She reported daily headaches as well as abnormal and burning sensations in her right thigh. Dr. Pardo-Villamizar noted that her symptoms were highly suggestive of meralgia paresthetica. The claimant still exhibited radiculopathic pain. (R. 598-99.)

On November 16, 2011, Dr. Lichtenstein sent a letter to Drs. McInerney, Young, Holt, and Hexter, and stated that the claimant had a diagnosis of sarcoidosis with caseating and non-

caseating granulomas; unexplained trace swelling and weakness in her legs; and a right ankle fracture with several surgeries. Dr. Lichtenstein stated that the claimant was "stable" but had no energy, and that he recommended she be more active; further, he stated that Dr. Holt, who treated her for the ankle fracture, would be the one to clear her for more activity. (R. 688).

The claimant returned to Dr. Yazdani for a follow-up on November 22, 2011. Dr. Yazdani noted that the claimant had sarcoidosis and enlarged thoracic lymph nodes and that she walked with support of a wheelchair. The claimant continued care with Dr. Yazdani, with twenty visits over the next two years. Over that time, the claimant primarily reported pain in her back, arms, legs, chest and joints; abdominal pain, nausea, and diarrhea; and fatigue. Dr. Yazdani also prescribed the claimant Prednisone, but discontinued the treatment because of side effects. (R. 647-49, 741-42, 768.)

Similarly, the claimant repeatedly visited Dr. Lichtenstein until October 2012. On April 13, 2012, the claimant reported that she was experiencing pain in the joints, back, arms, and legs. Dr. Lichtenstein gave the claimant a Methotrexate injection. On April 20, 2012, the claimant again reported pain, but Dr. Lichtenstein noted that the Methotrexate and Prednisone together were making the claimant feel much better.

On April 27, 2012, on referral from Dr. Yazdani, the claimant visited Kure Pain Management, where Dr. Doris Cope diagnosed the claimant with degenerative disc disease and lumbar radiculopathy. Dr. Cope gave the claimant an epidural injection for the pain; however, Dr. Lichtenstein stated that the claimant suffered from increased leg pain as a result. The claimant returned to Kure Pain Management on May 11, and Dr. Cope repeated that the claimant was crying and very emotional. Dr. Cope recommended that the claimant be treated for anxiety and receive counseling for her lower back pain.

The claimant returned to Dr. Lichtenstein on May 28 and July 27, receiving Methotrexate injections and complaining of pain. The claimant presented at the hospital on October 7, 2012, complaining of shortness of breath and painful breathing. The hospital notes further indicated that the claimant was previously diagnosed with asthma and was prescribed an Albuterol inhaler, which is often used to treat asthma. (R. 956-60). On October 16, 2012, the claimant returned complaining of difficulty breathing; Dr. Lichtenstein noted that she was "feeling well except for asthma," despite noting pain, and also noted clear breathing sounds. He further prescribed oral Methotrexate in lieu of an injection. (R. 676-87, 711-13, 760-63).

On July 20, 2012, the claimant underwent X-rays of her right foot and ankle by Dr. Charul Saini at the request of the state agency, which indicated mild enlargement in the right foot; mild bone loss in the ankle joint; and cortical thickening[7] and mild lucency at the distal fibula consistent with a healed fracture deformity. (R. 716).

On June 7, 2012, state agency examiner Dr. Gurcharan Singh reviewed the claimant's records. Dr. Singh diagnosed the claimant with peripheral neuropathy and found that the claimant could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours in an eight-hour work day; sit for six hours in an eight-hour work day; and push or pull without limitation. He further found that the claimant could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance and stoop, and occasionally kneel, crouch, and crawl. On August 13, 2012, a second state agency examiner, Dr. Judy Kleppel reviewed substantially similar information as Dr. Singh and came to the same conclusion. (R. 72-74, 100-06).

On August 8, 2012, the claimant's strength and range of motion were personally assessed by Dr. Sarah White at the request of the state agency. Dr. White found that the claimant had a

---

[7] Thickening of the outer layer of the bone.

full pain-free range of motion in all joints and extremities. She further found the claimant had grade five grip strength, with no limitation in the use of her hands, arms, or fingers. Dr. White concluded that although the claimant had a history of her legs giving way and decreased sensation to light touch in her thighs, that the claimant could exert twenty pounds of force occasionally and ten pounds of force frequently; could sit, stand, walk, carry, and handle objects up to twenty pounds; could speak and hear conversationally without impairment; and could drive and travel without restriction. (R. 727-731).

On September 4, 2012, the claimant filled out a form requesting information about her daily life and mental status. The claimant stated that her sleep varied greatly, sometimes sleeping eighteen hours and sometimes not at all; that she never attempted suicide; and that she had difficulties with memory because of sarcoidosis, but could follow simple instructions. The claimant went to a psychologist, Dr. Sara Phillips, at the request of the state agency for a mental status evaluation on September 14, 2012. The psychologist reported that the claimant had memory and concentration problems as well as a history of depression. (R. 735-39).

On January 16, 2013, the claimant completed a pain questionnaire at the request of the state agency. The claimant stated that her pain began in September 2009, and was located in her head, shoulders, arms, chest, upper and mid back, upper thigh, mouth, lower leg bones, ankles, abdomen, and eyes. The claimant stated that she would wake up in pain, end the day in pain, and several times during the day the pain would exceed her normal pain level. The claimant stated that her pain had abruptly changed her daily activities. She stated that before the onset of the pain, she was running two miles per day; after the onset of the pain, she progressively worsened from being unable to walk around the block to being unable to walk to the end of the driveway. She added that her pain was constant, with no pain-free moments. (R. 326-328).

In her "Function Report – Adult," also completed on January 16, 2013, the claimant described her daily life in detail. She stated that she could dress, care for her hair, and use the toilet without assistance, but sometimes needed help feeding herself, bathing, and caring for her pets. Further, she needed reminders to take medication, and could cook only "simple" meals with assistance. The claimant indicated that her condition affected her ability to lift, walk, climb, squat, kneel, stand, hear, see, understand, follow instructions, recall, complete tasks, and concentrate. She stated specifically she could not climb stairs at all, had lost significant memory, and required frequent rest when walking.  On January 16, 2013, the claimant additionally completed a "Fatigue Questionnaire" at the request of the state agency. She stated that she took a four to six hour nap per day, but at times slept most of the day; and that she regularly drove her son to and from work. (R. 329-40).

On February 1, 2013, the claimant's records were reviewed by state agency examiner Dr. Gregory Parker. Dr. Parker found that the claimant could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours in an eight-hour work day; sit for six hours in an eight-hour work day; and push or pull without limitation. He further found that the claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and could frequently balance and stoop, kneel, crouch, and crawl. (R. 141-143).

The claimant's records were also evaluated by Linda Duke, Ph.D., for a state agency mental residual functional capacity assessment on February 6, 2013. Dr. Duke found that the claimant was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public. Dr. Duke further indicated that the claimant should interact with the general public

infrequently; could understand, remember, and carry out short, simple instructions; and could concentrate for a reasonable period of time. (R. 144-45).

On August 14, 2013, the claimant returned to Dr. Hexter, her neurologist, complaining of memory loss. Dr. Hexter stated that he believed that the claimant's cognitive complaints were likely caused by a combination of her medications, depression, and insomnia, but that her normal mental status exam was reassuring. He further stated that neurocognitive testing would be necessary to better evaluate her cognitive complaints. Dr. Hexter conducted computerized neurocognitive testing on August 22, 2013, in which the claimant scored in the lower third percentile generally, and scored "very low" in the complex attention and memory areas. Dr. Hexter stated that the scores supported a diagnosis of mild cognitive impairment. Further, her score of thirty on the Autism Spectrum Rating Scale indicated a high likelihood of adult ADHD and her score of fourteen on the Epworth Sleepiness Scale suggested a significant sleep disorder. A brain MRI performed on August 23, 2013 and an electroencephalogram performed on August 26, 2013 showed no abnormalities. (R. 1058-60).

The claimant presented on August 19, 2013 to Dr. David Moller, a pulmonary specialist, at Johns Hopkins for a self-referred consultation. Dr. Moller reviewed the claimant's cumulative records, noting continued abdominal pain, burning pains spreading from the claimant's leg to right calf, occasional stabbing chest pains and difficulty breathing, fatigue, and continued use of a walker because of her legs giving out. Dr. Moller concluded that the claimant's sarcoidosis was multisystemic, rather than pulmonary, as a result of previous lung biopsies and indications of intrathoracic lymph node involvement. Dr. Moller stated that he suspected skin, salivary gland, and liver involvement with possible small fiber neuropathy, gastric dysmotility, or active neurosarcoidosis. Dr. Moller further noted that hepatic sarcoidosis was possible, and that

extreme fatigue and constitutional symptoms were characteristic of hepatic sarcoidosis. Dr. Moller further recommended starting the claimant on a low dose of Prednisone in addition to Methotrexate. (R. 844-48).

On October 15, 2013, Dr. Hexter completed a "Mental Impairment Questionnaire" and "Medical Opinion Re: Ability To Do Work-Related Activities" at the request of the Social Security Administration, Dr. Hexter stated that the claimant suffered from depression and attention deficit disorder; further, he stated that she exhibited persistent disturbances of mood, decreased energy, and easy distractibility. Dr. Hexter cited the claimant's normal Mini-Mental State Examination and the results of computerized neurocognitive testing, showing "significant problems in concentration, executive function" to support those diagnoses and impairments. Dr. Hexter stated additionally that the claimant had marked difficulty in remembering locations and work-like procedures; understanding, remembering, and carrying out simple instructions; maintaining attention and concentration over extended periods; performing activities on schedule; punctuality and regular attendance; working in coordination or in proximity to others while avoiding distraction; making simple work-related decisions; interacting appropriately with the general public; and accepting instruction and criticism from supervisors. Further, Dr. Hexter indicated that the claimant had moderate difficulty in getting along with coworkers without distracting them or exhibiting extreme behaviors; maintaining socially appropriate behavior; and responding appropriately to changes in the work setting. Dr. Hexter concluded that the claimant was not capable of performing a full time job eight hours per day, five days per week, on a regular and continuing basis; that the claimant could stand and walk for less than two hours; that the claimant could sit without limitation; that the claimant could lift and carry twenty pounds on a frequent basis; that the claimant would not need freedom to shift at will between sitting and

standing; and that the claimant would not need to lie down at unpredictable times during the eight-hour workday. Dr. Hexter further stated that the claimant suffered from burning numbness and chronic pain, exhibited an antalgic gait, and that the claimant would be absent from work more than three times per month because of her condition. (R. 870-73).

On October 23, 2013, Dr. Yazdani also completed a "Medical Opinion Re: Ability To Do Work-Related Activities" at the request of the Social Security Administration. Dr. Yazdani stated that the claimant was not capable of performing a full time job eight hours per day, five days per week, on a regular and continuing basis; that the claimant could stand and walk for less than two hours; that the claimant could sit for less than two hours; and that the claimant could lift and carry less than ten pounds on an occasional basis. Dr. Yazdani left blank the maximum amount the claimant could carry on a frequent basis, and stated that the questions of whether the claimant needed freedom to shift between sitting and standing or whether the claimant needed to lie down at unpredictable times during the workday were not applicable. Dr. Yazdani further stated that the claimant suffered from nerve pain, chronic obstructive pulmonary disorder, shortness of breath, and pain generally, and that the claimant would be absent from work more than three times per month because of her condition. (R. 869).

On October 23, 2013, Dr. Lichtenstein completed a "Medical Opinion Re: Ability To Do Work-Related Activities." Dr. Lichtenstein stated that the claimant was not capable of performing a full time job eight hours per day, five days per week, on a regular and continuing basis; that the claimant could stand and walk for less than two hours; that the claimant could sit for less than two hours, that the claimant could lift and carry less than ten pounds on an occasional or frequent basis; that the claimant would need freedom to shift at will between sitting and standing; and that the claimant would need to lie down at unpredictable times during the

eight-hour workday. Dr. Lichtenstein further stated that the claimant suffered from joint pain, nerve pain, and numbness in her arms and legs because of her sarcoidosis, and that the claimant would be absent from work more than three times per month because of her condition. (R. 927).

*The ALJ Hearing*

At the claimant's hearing before the ALJ on August 7, 2014, the claimant testified that her disability claim was based on sarcoidosis and unspecified related issues. (R. 45). She stated that at the time of the hearing, she lived with her sister. (R. 42).

The claimant testified that she could not climb three stairs without difficulty; could not ambulate outside her house without a walker; and could not ambulate inside her house without a cane. She testified that her legs would give out unpredictably, forcing her to use a walker to avoid falling in public. She further claimed that she suffered from recurring migraines, rumbling in her ears, and painful breathing. Additionally, the claimant testified that she experienced pain when walking, and increased pain when changing the positions of her body between sitting, reclining, and propping. Furthermore, the claimant stated that neurological testing had showed "cognitive something" as a mental issue and that, for a long time, she was told that her medications were the cause of any mental problems. However, she further stated that her pain in her legs would return "full force" if she did not take her medication, and that even with her medication she would wake up screaming because of the pain. (R. 42-47).

The claimant stated that she was taking Gabapentin (for leg pain) at the maximum dosage, Zoloft, and Amitriptyline. She added that she had tried Lyrica but it made her legs swell to the point that she could not walk. Per the claimant, other pain medications, such as morphine, caused allergic reactions; accordingly, her doctors prescribed anti-inflammatories to help reduce

the pain. The claimant also stated that her medications had significant side effects, including causing extreme fatigue, shakiness, and nausea. (R. 48-49).

The claimant described a significantly impaired daily life. According to the claimant, most activities of daily living caused her extreme fatigue and forced her to rest. The claimant testified that sweeping, laundry, and cooking each caused her immediate fatigue. She further stated that she spent six hours of her eight-hour day lying down. Additionally, she had difficulty sleeping, and would often not sleep for two days then sleep for eighteen hours straight. Although she would sometimes sleep for eight hours in a night on a "good night," she stated that she would be tired upon waking up. If she went out to a grocery store, she stated that she had to rest the day before and three days after because of the level of exertion required. She further stated that she visited the grocery store at least once per week, even for a couple of items, so that she was not stuck at home constantly. (R. 52).

The claimant stated that she can sit for thirty minutes without having to change positions; that she can stand in one place for no more than "a couple minutes"; and that she can walk approximately two grocery store aisles before needing to rest. She additionally stated that she elevates her legs when sitting. (R. 52-53).

The claimant testified that she has a weight-lifting restriction of either ten or twenty pounds from a previous shoulder injury, but could not lift that much now. She stated that lifting a gallon of water was difficult for her. Further, she stated that she had difficulty with postural movements, such as bending, stooping, and crouching; also, she testified that she could not get back up if she bent down, and that any repetitive overhead pushing or pulling caused her arms to "give out." She added that using her left arm was more difficult than her right arm. Further, the

claimant stated that she would experience pain when manipulating objects, as well as "bone movement in her left wrist." (R. 53-55).

According to the claimant, she could take care of her personal needs such as bathing and grooming with difficulty. She further stated that everything she did regularly around her house forced her to stop and rest afterwards. Although she used a computer and read regularly in the past, she stopped performing those activities prior to the hearing, and had no other hobbies. (R. 55-56).

The claimant stated that she had difficulty with concentration and focus, stating that she could pay attention but did not always understand. She further added that she had memory difficulties, and that she would often check her calendar for appointments in the morning and forget about the appointment later in the day. (R. 56-57).

A vocational expert, Mina Alexander-Schwartz, testified regarding the type and availability of jobs the claimant could perform. Ms. Alexander-Schwartz testified that the claimant's past relevant work was medical billing manager, classified as skilled with a sedentary exertion level; billing manager, classified as skilled with a sedentary exertion level; asphalt sealer, classified as unskilled with a light exertion level; and construction inspector, classified as skilled with a light exertion level. (R. 59-60).

The ALJ asked Ms. Alexander-Schwartz to assume a hypothetical individual of the same age and educational background as the claimant, with the same work history, and the residual functional capacity to perform a range of light work. The hypothetical individual was further limited to sitting six hours of an eight-hour workday and standing or walking for a total of six hours an eight-hour workday. The hypothetical individual could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and could frequently balance, stoop, kneel, crouch, and crawl. The

hypothetical individual could not work under concentrated exposure to extreme temperatures, machinery, heights, or other hazards. Further, the hypothetical individual could not work under any exposure to fumes, odors, dust, gases, or poor ventilation. The hypothetical individual also could not follow more than one to two step instructions and could maintain attention and concentration for extended periods on a limited basis. (R. 60-61).

Ms. Alexander-Schwartz testified that the hypothetical individual could not perform any of the claimant's past work. However, the hypothetical person could perform other work that existed in significant numbers in the national economy. Ms. Alexander-Schwartz stated that the hypothetical individual could work as a mail sorter, with 100,000 jobs available nationally and 2,700 locally; as a pricer marker, with 1,800,000 jobs available in nationally and 34,000 locally; and as a light assembler, with 198,000 jobs available in nationally and 3,600 locally. Ms. Alexander-Schwartz stated that each of the three jobs named were classified as light work. (R. 61).

The ALJ then asked Ms. Alexander-Schwartz to consider a hypothetical individual with the same limitations as the first hypothetical, but limited to sedentary work. Ms. Alexander-Schwartz stated that the second hypothetical individual could work as an information clerk, with 900,000 jobs available nationally and 20,000 locally; as an order clerk, with 200,000 jobs available nationally and 2,000 locally; and as a clerical addresser, with 96,000 jobs available nationally and 2,000 locally. Ms. Alexander-Schwartz stated that each of the three jobs named were classified as sedentary work. (R. 61).

The claimant's attorney asked Ms. Alexander-Schwartz to consider a hypothetical individual with the same limitations as the second hypothetical, but additionally restricted to standing, walking, or sitting less than two hours in an eight-hour workday; sitting and standing at

will; lying down at unpredictable times during the day for up to six hours; carrying less than ten pounds occasionally or frequently; and being absent more than three days per month from any employment. Ms. Alexander-Schwartz stated that no jobs existed in significant numbers in the national economy for that hypothetical individual. (R. 63).

*The ALJ's Decision*

On October 22, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 27). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through March 31, 2014, and had not engaged in substantial gainful activity from her alleged onset date of September 10, 2009. (R. 13).

Next, the ALJ found that the claimant had the severe impairments of sarcoidosis, status post-right ankle fracture, degenerative disc disease, obesity, and depression. The ALJ further noted that the claimant alleged additional impairments, included but not limited to a benign brain tumor, benign liver hemangiomas, and possible rheumatoid arthritis; however, the ALJ stated that the alleged additional impairments did not cause a significant decline in the claimant's functional ability that was supported by the medical evidence of record. (R.13-14).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for Listing 3.02 for chronic obstructive pulmonary insufficiency. The ALJ concluded that the medical evidence of the claimant's sarcoidosis did not show impaired respiratory function sufficient to meet the criteria for Listing 3.02. Next, the ALJ considered whether the claimant met the criteria for Listing 11.14, peripheral neuropathy, and determined that the claimant had

not demonstrated peripheral neuropathy with disorganization of motor function. The ALJ next considered whether the claimant met the criteria for Listing 1.06, nonunion of fracture, and determined that the objective imaging did not show a fracture that met the criteria of Listing 1.06. Further, the ALJ considered if the claimant's degenerate disc disease met the criteria for Listing 1.04, and found no evidence of the specifically listed medical conditions in Listing 1.04. The ALJ additionally considered the effect of the claimant's obesity on the claimant's ability to perform routine activities in the work environment in combination with her other impairments as per SSR 02-1p. Next, the ALJ compared the effects of the claimant's mental impairment with the "paragraph B" and "paragraph C" criteria, and found that those effects did not rise to the level of "marked" as required by Paragraphs B and C and, thus, that the claimant did not meet Listing 12.04. (R. 14-15).

The ALJ concluded that the claimant possessed the residual functional capacity (RFC) to perform sedentary work with both physical and mental limitations, The claimant could occasionally lift ten pounds; frequently lift less than ten pounds; could stand or walk for up to two hours of an eight-hour workday; could sit for six hours during an eight-hour workday; could occasionally climb; could frequently balance, stoop, kneel, crouch, and crawl; could perform jobs with up to two step instructions; and could interact with the public occasionally to frequently. The ALJ further stated that that the claimant could not work around fumes, odors, dusts, gases, and poor ventilation, and was limited in maintaining attention and concentration for extended periods. (R. 16).

The ALJ considered the claimant's symptoms and relevant medical records in making the RFC determination. The ALJ found that, although the claimant's impairments could be reasonable expected to cause the symptoms alleged, the claimant's statements only partially

credible regarding the intensity, persistence, and limiting effects of the alleged symptoms and gave them little weight, stating that the claimant's symptoms were "disproportionate" to the objective and clinical evidence. The ALJ pointed to the claimant's conservative sarcoidosis treatment, with no surgical intervention aside from biopsies in 2009; successful management of the claimant's sarcoidosis symptoms by medication; and positive leg strength and gait despite alleged leg pain. The ALJ noted that the claimant was a regular cigarette smoker until seven months prior to the hearing, with Dr. Chen indicating that the claimant's shortness of breath was likely caused by smoking and weight gain; the ALJ found the claimant's continued smoking suggestive of less limiting symptoms than alleged.(R. 21).

The ALJ additionally noted that the claimant showed no residual issues from her 2010 right ankle fracture and had never received surgery or a recommendation for surgery to treat her degenerative disc disease. The ALJ further found that the claimant's obesity, alone and in combination with her other impairments, would not limit her more physically than reflected in her RFC determination. (R. 21-22).

 The ALJ stated that although the claimant used a walker to ambulate outside her house, the objective medical evidence did not support the continued usage of the walker. The ALJ cited the claimant's prescription of a walker[8] by Dr. Holt on March 29, 2011 to be used after ankle surgery, followed by Dr. Holt clearing the claimant for full activity on September 16, 2011 and Dr. Lichtenstein questioning why the claimant needed a walker or had increased pain. (R. 22).

Although the ALJ noted that the claimant described limited daily activities, the ALJ cited two factors that weighed against finding the claimant disabled. First, the ALJ noted that allegedly limited daily activities are not objectively verifiable with a reasonable degree of certainty. Second, the ALJ stated that even if the claimant's activities were as limited as she claimed, the

---

[8]  However, the record shows that the prescription was not for a walker but a walking boot. (R. 573).

objective medical evidence did not support attributing the limitation of her activities to her medical condition. (R. 22).

In reaching her findings, the ALJ gave little weight to the assessments of the claimant's treating physicians, Drs. Lichtenstein, Hexter, and Yazdani. The ALJ stated that Dr. Yazdani's opinion was based primarily on the claimant's subjective complaints and was inconsistent with the medical record as a whole. Next, the ALJ stated that the extent of the limitations proscribed by Dr. Lichtenstein for the claimant was not supported by the objective evidence, including Dr. Lichtenstein's treatment record. The ALJ specifically noted that Dr. Lichtenstein stated in his November 16, 2011 letter that the claimant used a walker because of her right ankle fracture, and that Dr. Holt would presumably be the one to clear the claimant for more activity; however, the ALJ noted that Dr. Holt had already cleared the claimant for more activity. The ALJ further stated that Dr. Lichtenstein reported the claimant on October 9, 2012 as "feeling well except for asthma" but also noted that the claimant's breath sounds were normal.[9] (R. 23).

The ALJ stated that Dr. Hexter's medical opinion lacked support from the objective medical evidence. The ALJ cited Dr. Hexter's lack of a longitudinal treatment relationship with the claimant, stating that Dr. Hexter had only seen the claimant for two months.[10] The ALJ also stated that Dr. Hexter's medical opinion showed a conflict between computerized neurocognitive testing, showing problems in the claimant's concentration and executive functioning, and a mental status examination that indicated normal results. Accordingly, the ALJ found that Dr.

---

[9] The ALJ misstates the date of this visit, which was October 16, 2012. The record shows that the claimant was admitted to the hospital on October 7, 2012, nine days before her visit with Dr. Lichtenstein, complaining of shortness of breath and painful breathing. Further, the hospital notes indicate that the claimant had a previous asthma diagnosis and prescription for an Albuterol inhaler, which is often used to treat asthma. (R. 761-62, 956-60).
[10] The record shows that Dr. Hexter saw the patient for testing on July 8, 2011 and received a detailed update from Dr. Lichtenstein on the claimant's condition on November 16, 2011. (R. 536, 898).

Hexter's opinion of the claimant's limitations was based primarily on the claimant's subjective complaints. (R. 23).

The ALJ gave great weight to consultative examiner Dr. Sarah White's August 3, 2012 opinion, stating that her findings were well-supported by the objective evidence from her exam. However, the ALJ found the claimant to be more limited than Dr. White indicated because of the claimant's combination of impairments. The ALJ gave some weight to the state agency examiner Dr. Singh, as his opinion was based on a review of the record through June 7, 2012, and greater weight to state agency examiner Dr. Judy Kleppel, who on August 13, 2012, affirmed Dr. Singh's opinion and further limited the claimant to only occasional balancing and stooping. (R. 24). The ALJ gave great weight to state agency examiner Dr. Gregory Parker's February 1, 2013 medical opinion based on a review of medical records; the ALJ stated that the opinion was supported by the record as a whole, and adopted Dr. Parker's opinion of the claimant's nonexertional impairments. Further, the ALJ considered the medical opinion of state agency psychological consultant Linda Duke, Ph.D. and accorded her opinion some weight. (R. 24-25).

Next, the ALJ, relying on the testimony of the vocational expert, found that the claimant was unable to perform any of her past relevant work. The ALJ determined that, based on the claimant's age, education, work experience, and residual functional capacity, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of the vocational expert, that jobs existed in significant numbers in the national economy that the claimant can perform. Accordingly, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 30-31).

## VI. DISCUSSION

*Weight given to treating sources by the ALJ*

The claimant argues that the ALJ erred in giving little weight to the claimant's treating physicians, Drs. Lichtenstein, Hexter, and Yazdani, because the ALJ's findings are not supported by substantial evidence. This court agrees and finds that substantial evidence does not support the ALJ's reasons for discrediting the opinions of the claimant's treating physicians.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician absent showing good cause to the contrary. *Winschel v Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when the evidence does not support a treating physician's opinion; the evidence supports a finding to the contrary; or when the treating physician's opinion is conclusory or inconsistent with the physician's own records. *Winschel*, 631 F.3d at 1179 (citation omitted). The ALJ must "clearly articulate" reasons for discounting the opinion of the treating physician. *Philips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

If the ALJ expresses specific reasons for discounting the opinion of the treating physician, but substantial evidence does not support those reasons, the ALJ commits reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). In reviewing the ALJ decision, the district court must assess the record in its entirety, considering evidence both supporting and undermining the ALJ's decision; however, the court "must not reweigh the evidence." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted). Further, the court should look to the rationale actually offered by the ALJ, not "reasoning that 'might have supported the ALJ's conclusion but was not offered by the ALJ himself.'" *Hubbard v. Colvin*, 643. F. App'x. 869, 873 (11th Cir. 2016) (per curiam) (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam)).

*Dr. Lichtenstein*

The ALJ found that the extent of limitations expressed by Dr. Lichtenstein, the claimant's treating rheumatologist, lacked support from the objective evidence, including Dr. Lichtenstein's own treatment records. First, the ALJ noted that Dr. Lichtenstein stated on November 16, 2011, in a letter to four of the claimant's other doctors, including Dr. Holt, the claimant's orthopedist, that the claimant had only trace edema (swelling); that she continued to walk with a walker "presumably" because of her fractured ankle; that Dr. Holt would be the one to clear her for more activity; and that the claimant was otherwise "quite stable." Second, the ALJ noted that Dr. Holt had already indicated on September 6, 2011 that the claimant could "resume full activity." Third, the ALJ noted Dr. Lichtenstein's October 16, 2012 assessment of the claimant as "feeling well except for asthma" in contrast to the claimant's normal, clear breathing sounds the same day.

The examples that the ALJ cites fail to provide "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" to undermine the credibility of Dr. Lichtenstein as a treating source. Dr. Lichtenstein's November 2011 statements do not conflict with his own records. Although Dr. Lichtenstein did say that the claimant was "quite stable," he noted on multiple later occasions that the claimant was in severe pain because of her sarcoidosis.

Similarly, Dr. Lichtenstein's statement that Dr. Holt would be the one to clear the claimant for more activity does not contradict the objective evidence. As the claimant's rheumatologist, Dr. Lichtenstein was not primarily responsible for evaluating the claimant's ankle fracture. On the other hand, as the claimant's orthopedist and post-fracture surgeon, Dr. Holt was responsible for evaluating the condition of her ankle at that time. Although the ALJ notes that Dr. Holt cleared the claimant for full activity approximately two months prior to Dr. Lichtenstein's statements, the record is devoid of any communication from Dr. Holt to Dr.

Lichtenstein prior to Dr. Lichtenstein's letter. Accordingly, Dr. Lichtenstein's statement that Dr. Holt would need to clear the claimant for more activity, presumably based on the status of her ankle, reflects both of their distinct roles in the claimant's medical care and the difficulty in coordinating care for patients with complex conditions. It is not, however, a showing of inconsistency with Dr. Lichtenstein's own records or the objective evidence needed to serve as substantial evidence to give little weight to Dr. Lichtenstein as a treating source.

Second, the ALJ's finding of inconsistency in Dr. Lichtenstein's October 16, 2012 assessment of the claimant ignores evidence directly supporting Dr. Lichtenstein's findings of that date. The record shows that the claimant was in the hospital on October 7, 2012, nine days before her visit with Dr. Lichtenstein, complaining of shortness of breath and painful breathing. Further, the hospital notes indicate that the claimant had a previous asthma diagnosis and prescription for an Albuterol inhaler. Dr. Lichtenstein noting asthma as a new issue since the last visit, regardless of the claimant exhibiting asthma symptoms on that date, is consistent with the record. Furthermore, Dr. Lichtenstein's statement that the claimant was "feeling well" is equally insufficient to negate his medical opinion. Although Dr. Lichtenstein stated that the claimant was "feeling well," he still noted that the claimant was experiencing pain. Thus, this statement does not show inconsistency with Dr. Lichtenstein's own records or the objective evidence sufficient to give Dr. Lichtenstein's opinion little weight as a treating source.

Furthermore, the ALJ's evaluation of Dr. Lichtenstein's opinion falls short in other ways. The statements of the ALJ about Dr. Lichtenstein's reports regarding the claimant's ankle and asthma, even if *supported* by substantial evidence, fail to detract from the extent of limitations asserted by Dr. Lichtenstein. In his medical opinion, Dr. Lichtenstein stated that the claimant's diagnosis of sarcoidosis and rheumatoid arthritis caused symptoms of joint pain, nerve pain, and

numbness in her arms and legs, causing her asserted physical limitations. Isolated excerpts from the record discussing the status of the claimant's ankle and asthma symptoms fail as evidence adequate to support a conclusion that the extent of limitations stemming from joint pain, nerve pain, and numbness in the arms and legs is worthy of little weight.

*Dr. Hexter*

The ALJ gave little weight to the medical opinion of Dr. Hexter, stating that it was both unsupported by the objective evidence and in conflict with the record as a whole. In support of this assertion, the ALJ stated that Dr. Hexter had only treated the claimant for two months at the time he gave his medical opinion and, thus, lacked a longer view of the claimant's impairments; that Dr. Hexter's results from computerized neurocognitive testing conflicted with the claimant's normal mental status examination results; and that Dr. Hexter's opinion of the claimant's limitations appeared to be based on the claimant's subjective complaints.

The ALJ's statement that Dr. Hexter lacked a "longer longitudinal view" of the claimant's impairments lacks merit. The record shows that the claimant visited Dr. Hexter in July 2011 and that Dr. Hexter received a detailed update on the claimant's condition from Dr. Lichtenstein in November 2011. This previous treatment history shows a longer view of the claimant's condition than the ALJ asserted. Furthermore, the ALJ gave great weight to various consulting physicians who either only saw the claimant personally once or did not see the claimant at all. The conclusion that Dr. Hexter's opinion lacks weight because of the shorter length of the treatment relationship applies in equal or greater force to the conclusions of the consulting physicians, and the court finds this rationale does not detract from the credibility of Dr. Hexter. *See Lewis*, 125 F.3d at 1440-41 (concluding that a rationale that applies to one medical source applies equally to other applicable medical sources).

The ALJ's characterization of the discrepancy between the computerized neurocognitive testing and the mental status examination also is not supported by substantial evidence. The record indicates that although Dr. Hexter found the claimant's normal mental status examination "reassuring," he also ordered the computerized neurocognitive testing specifically to evaluate the claimant's neurocognitive complaints. Furthermore, rather than showing inconsistency with the objective evidence, Dr. Hexter's showing normal results on the mental status examination comports fully with the results of the mental status examination performed by Dr. Sara Phillips, the state agency psychological examiner, and upon whose results Dr. Linda Duke's medical opinion, which received some weight, was based. The opinions of Drs. Phillips and Duke were rendered prior to the claimant receiving computerized neurocognitive testing; therefore, rather than conflicting with the record, Dr. Hexter's opinion is more fully supported by having the benefit of objective evidence not available to the consulting physicians.

Additionally, the ALJ's assertion that Dr. Hexter's opinion is based primarily on the claimant's subjective complaints ignores the fact that the opinion given in the Mental Impairment Questionnaire comports with objective results from the computerized neurocognitive testing that the claimant "scored very low in the complex attention and memory domains." Thus, for the above reasons, the evidence cited by the ALJ does not constitute substantial evidence to support the ALJ's giving little weight to Dr. Hexter's opinion.

*Dr. Yazdani*

The ALJ discredited Dr. Yazdani's medical source opinion as unsupported by the objective evidence of record, based on subjective complaints, and in conflict with the record as a whole. The ALJ's opinion lacks any mention of Dr. Yazdani's clinical findings or reference to his treatment records. The ALJ did not "clearly articulate" reasons for discounting the source

opinion of Dr. Yazdani, and did not cite any "substantial evidence" to support her decision to discredit Dr. Yazdani. Moreover, Dr. Yazdani's independent medical source opinion is largely consistent with that of Dr. Lichtenstein, lending weight to the credibility of both physicians. Therefore, the court finds substantial evidence does not support the ALJ's conclusion that Dr. Yazdani's opinion be given little weight as a treating source.

As the ALJ's RFC determination gave little weight to the opinions of the claimant's treating physicians, this court finds it unsupported by substantial evidence and in need of reevaluation, including in its evaluation of the claimant's nonexertional impairments, on remand.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED. The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 22nd day of August, 2017.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE